**UNITED STATES of America, Appellee,**

v.

**Gordon Wayne ROY, Appellant.**

**No. 87–5037.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 16, 1987.

Decided April 4, 1988.

Peter Thompson, Minneapolis, Minn., for appellant.

Joan N. Ericksen, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before JOHN R. GIBSON, BOWMAN and WOLLMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Gordon Roy appeals from his conviction of second degree murder. 18 U.S.C.A. § 1111 (West Supp.1987). On appeal, he argues that the district court[1] erred in permitting a witness to testify to and compare out-of-court statements of Roy's accomplices; in denying instructions Roy requested regarding lesser included offenses; and in admitting evidence of Roy's flight from police and giving a particular instruction on flight as evidence of guilt. The conviction is affirmed.

Roy was convicted for killing Darin White on the Red Lake Indian Reservation; Roy and White were both Indians. The evidence was that Roy become embroiled in a conflict at a party at Anna Thunder Knudtson's house in the early morning hours of August 2, 1986. Not only was he asked to leave, but the other guests hastened his departure by shooting at him. White was one of the guests at the party. Roy drove his car a short distance from the party with his three passengers, Darwin Neadeau, Darwin Stately and Sam Hill, but Neadeau and Roy returned on foot to the vicinity of the party. Roy apparently found Darin White alone and beat White, either with a weapon or his fists. Roy then asked Neadeau to bring the car around, and Roy forced White into the back seat of the car with him. All five men drove to a secluded spot on the Reservation, where Roy took White out of the car and "chopped" his throat with a machete. The testimony differs about the extent to which Neadeau, Stately and Hill then participated in beating White, but at any rate some or all of them hit him with a tire iron, car jack, chain and padlock, and boots until he died.

Roy and Neadeau put White's body in the trunk of the car and drove to another remote spot, where they abandoned the corpse by an oak tree. Police found the body badly decomposed, about two weeks later.

After leaving White's body by the oak tree Roy and his accomplices got back in the car and Roy drove them to North Dakota. En route Roy hit another car, but continued driving until he came to a field, where he parked behind some grain bins. State police officers arrived on the scene to arrest Roy for the hit and run accident, and Roy ran away on foot before they reached his car. After the police apprehended Roy, he asked several times what he was being charged with.

---

1. The Honorable Edward J. Devitt, Senior United States District Judge for the District of Minnesota.

Eventually all three of the accomplices gave statements inculpating Roy. At trial they testified against him. On cross-examination Roy's attorney questioned them about inconsistencies in their stories; opportunities they had had to get together and manufacture a story; and the facts that Stately and Hill had not been prosecuted and that Neadeau had entered a plea bargain in which he agreed to testify against Roy. The clear import of the cross-examination was that the accomplices had manufactured a story falsely blaming Roy for the murder in order to minimize their own punishments.

The prosecutor then called the FBI agent who had investigated the case, Joseph Ryan. Ryan testified about the accomplices' post-arrest statements to him about the killing. Roy did not testify, but he argued through his attorney that he did not participate in the killing, but had merely been present when Stately, Hill and Neadeau killed White. He also presented evidence that Roy was intoxicated at the time of the killing and that Roy's uncle, whom he visited briefly on the way to North Dakota the morning of the murder, did not see any blood on Roy.

Roy was convicted of second degree murder and sentenced to life imprisonment.

The first group of issues arises from the trial testimony of FBI Agent Joseph Ryan. Ryan testified at length about his investigation of the Darin White killing, including his interviews with Neadeau, Hill and Stately. Roy argues that Ryan should not have been allowed to testify about the accomplices' out-of-court statements or his conclusions that their stories were consistent and truthful.

■ We reject Roy's argument attacking the admission of Ryan's testimony recounting the accomplices' prior consistent statements. Roy argues that the statements were all made after the accomplices had a motive to fabricate a story shifting the blame to Roy. Roy relies on *United States v. Bowman*, 798 F.2d 333, 338 (8th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987), in arguing that admission of the accomplices' statements was therefore erroneous. However, the district court's charge to the jury in this case limited the use of Ryan's testimony to rehabilitation of the accomplices' testimony and excluded it as substantive proof.[2] *Bowman* specifically held that prior consistent statements made after the existence of a motive to fabricate are admissible for rehabilitation, though not as substantive evidence. Therefore, there was no error in admitting the prior consistent statements for the limited purpose of rehabilitation. *Id.* at 338.[3]

However, we are deeply troubled by Roy's argument that Ryan's testimony amounted to an impermissible opinion that the accomplices' testimony was consistent and truthful. Roy has complained about numerous excerpts from Ryan's testimony in this regard and we begin by observing that Roy failed to object to several of the statements at trial;[4] accordingly, we have

---

2. The court's charge to the jury stated: "We had testimony on Friday last from Agent Ryan of the FBI. * * * He told us what Neadeau, Stately and Hill had previously told him. * * * Now, previously, Neadeau, Stately and Hill had testified before us. So it seems to me we heard most of what he told us. And they were subject to Cross Examination. But Mr. Ryan's testimony on the subject was received not in support of the truth of those statements, but only to assist the Jury in judging the truthfulness of the witness' statements." Transcript ("Tr.") 650.

3. Roy also relies on *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), in arguing against admission of the prior consistent statements. *Lee* was decided under the confrontation clause and does not apply in this case, in

which the accomplices all testified at trial and were subject to exhaustive cross-examination.

4. The unobjected to statements were:
   1. In response to the prosecutor's questioning about why Ryan consulted local police after interviewing the accomplices, Ryan stated: "[W]e were attempting to ascertain if we were getting some facts, if we were getting the truth." Tr. 474.
   2. In response to the question of whether there was anything "memorable" for him in his interview of Stately, Ryan said, "[t]he thing that was memorable * * * was the amount of detail he seemed to recall * * *." Tr. 482–83. The only objection was to hearsay, not to improper opinion evidence.
   3. Ryan said investigators interviewed Anna Thunder Knudston and Harold Brun because

reviewed those statements only for plain error and have concluded that none of them had a substantial adverse effect on Roy's rights, amounting to a miscarriage of justice. *See United States v. Resnick,* 745 F.2d 1179, 1183 (8th Cir.1984). However, two other passages in Ryan's testimony were objected to at trial and they pose greater problems.

First, Ryan was allowed to compare the accomplices' out-of-court statements at some length and to opine that their stories were similar.[5] At the end of this line of questioning Ryan stated that based on the similarity of the accomplices' stories, the investigators concluded they were "getting some facts" from the accomplices. Tr. 485–86.

Second, on redirect the prosecutor began asking questions that established Ryan's experience and expertise in investigating multi-defendant criminal cases and determining "whether a story has been manufactured." Tr. 553. She then asked him: "And can you describe a little bit about what you learned and how you applied that learning to this case?" Ryan answered that he looked for consistency of minute detail in the accomplices' stories and that such consistency existed in this case. Tr. 554. He later testified: "It becomes obvious, after a period of years, that if people get together and concoct a story, they'll probably get certain facts right, certain very important facts like who had the weapon, or who went into the bank first, or something like that, but they don't get down to minute details * * *. That type of detail is what we're looking for—inconsistencies." Tr. 555–56.

Roy argues that these passages amount to an opinion by Ryan on the truthfulness of the accomplices' testimony and that Ryan was presented as if he were an expert in determining who is telling the truth in multi-defendant criminal cases. In *United States v. Azure,* 801 F.2d 336, 339–41 (8th Cir.1986), this court reviewed the law regarding expert testimony on the truthfulness of a witness' testimony. In *Azure,* we reversed a statutory rape conviction because a pediatrician and expert on child abuse had testified that the alleged victim was believable and that "he could 'see no reason why she would not be telling the truth in this matter....' " *Id.* at 339. *Azure* acknowledged that the district court's decision to admit expert testimony will not be reversed absent abuse of discretion, *id.* at 340, but concluded that permitting expert testimony on the truthfulness of a witness' testimony may be such an abuse because it undermines the jury's role as arbiter of credibility. *Id.* at 340–41.

This case falls within the reasoning and the rule of *Azure.* There was testimony that tended to establish Ryan as an expert in getting to the bottom of a criminal case [6] and the offending passages of Ryan's testimony intimate that Ryan believed the accomplices' statements were true. Therefore, we are bound by *Azure* to conclude that admitting Ryan's opinion testimony was an abuse of discretion.

However, there are significant differences between the testimony here and in *Azure,* which lead us to believe the error was harmless here, though it was reversible in *Azure. Id.* at 341. In *Azure,* the pediatrician was "impressively qualified" to opine on the behavior of child sexual abuse victims, which is "a matter ... beyond [the

---

they wanted to find "other people who * * * might be able to furnish some information that would tend to lend credibility to the statements given by Mr. Stately, Hill and Neadeau or might tend to discredit this information." Tr. 486.

5. Examples of such testimony are as follows: 1. "I noted a great deal of similarity between the statement as furnished by Mr. Neadeau [and] the statement as furnished by Mr. Stately, with one notable exception." Tr. 483–84.

2. "Again, I noted very many consistencies in the story of Mr. Hill and the story of Mr. Stately and, also, the information as provided by Mr. Neadeau * * *." Tr. 484–85.

6. It is not necessary to decide whether there was a sufficient foundation to establish Ryan as an expert; the point here is not whether he was actually an expert, but that the government introduced evidence to bolster the authority of Ryan's opinion and thereby created a danger that the jury would defer to his judgment on credibility of the testimony.

jurors'] common knowledge and ordinary experience." *Id.* at 340. Under these circumstances, there would be a real danger that the jurors would abandon their own common sense evaluation of credibility in favor of the expert's scientific evaluation. In this case, the foundation laid for Ryan's testimony was not elaborate and there was no evidence of any training or education giving Ryan some great advantage over the jurors in divining truth. Moreover, Ryan testified that his touchstone for truth or falsity was only the common sense notion that if several persons' stories are consistent in minute detail, they are likely to be true. This pedestrian conclusion was not likely to sweep the jurors off their feet. Moreover, Ryan's conclusion that the accomplices' story was truthful and consistent was attacked at length by Roy's attorney on cross-examination of Ryan and of the three witnesses Ryan talked about. Moreover, the prosecutor made no use of the Ryan testimony on credibility in her closing argument. In sum, we do not believe the effect of Ryan's impermissible opinion testimony was highly persuasive.

On the other hand, the evidence against Roy was overwhelming. The evidence included testimony of three eyewitnesses to the murder itself; the discovery of the murder weapons in the car Roy had been driving; and Roy's flight from police officers the day of the murder. There was no substantial evidence supporting Roy's theory that the accomplices committed the murder without Roy's participation.

Roy argues that the error was compounded when the court gave the instruction that Ryan's testimony was to assist the jury in evaluating the other witnesses' testimony, *see* the instruction *supra* at note 2, but the court also instructed the jury that the jury was the sole arbiter of credibility.

In light of the overwhelming evidence against Roy, the lack of persuasive power of the erroneously admitted evidence, and the defense attorney's thorough challenge to Ryan's opinions on cross-examination, we conclude that on the record as a whole the error in admitting Ryan's opinion was harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *United States v. Awkard,* 597 F.2d 667, 671–72 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979) (improper expert opinion on credibility harmless error under Ninth Circuit variant of test).

■ Roy next raises two points regarding jury instructions. First, he argues that the district court erred in not giving an instruction that if the jury had a reasonable doubt as to whether it should convict of murder or the lesser included offense of manslaughter, it should convict of the lesser offense. Roy argues he submitted a written request for such an instruction and under *United States v. Hanson,* 618 F.2d 1261, 1265–66 (8th Cir.) *cert. denied,* 449 U.S. 854, 101 S.Ct. 148, 66 L.Ed.2d 67 (1980), he was entitled to such an instruction. The language in *Hanson* actually only indicates that a defendant who makes a timely request may be entitled to elect between an instruction like the one Roy submitted and an alternate form instructing the jurors that if they do not unanimously find the defendant guilty of murder, they must then consider whether he is guilty of manslaughter. The court gave an instruction in the alternate form.[7] However, the record shows that no matter what written form he submitted, Roy's counsel agreed in the instruction conference without any reservation to the instruction as given, Tr. 613–14, and did not orally ask the judge to give the alternate form until the jury had already begun deliberating. Tr. 657–58. Therefore, Roy was not deprived of any right to choose the form of the instruction.

---

7. The instruction actually given was: "If you do not find by unanimous vote that the defendant is guilty as charged in the indictment, then you are to consider an alternate verdict, a special verdict for manslaughter, which I will read for you. * * * So if you find the defendant not guilty as charged in the indictment, then you are to consider this special verdict on manslaughter and make a unanimous verdict that you find him guilty or not guilty of manslaughter." Tr. at 652–53.

Roy next argues that the district court should have instructed the jury on the lesser included offenses of assault with a dangerous weapon, 18 U.S.C. § 113(c) (1982), and assault by striking, beating, or wounding, 18 U.S.C. § 113(d) (1982). Lesser included offense instructions should be given when:

(1) there is a proper request;

(2) the elements of the lesser offense are identical to part of the elements of the greater offense;

(3) there is evidence that would support conviction of the lesser offense;

(4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that the jury could consistently acquit on the greater offense and convict on the lesser.

*United States v. Collins*, 652 F.2d 735, 741–42 (8th Cir.1981), *cert. denied*, 455 U.S. 906, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982). In this case as in *Collins*, the defendant did not present evidence at trial that refuted the elements differentiating the greater from the lesser crime, there was no conflict in the crucial evidence supporting conviction of the greater crime, and the defendant claimed complete innocence throughout the trial. *Id.* at 742. Therefore, as in *Collins*, the proof of the elements differentiating the greater from the lesser crimes is not sufficiently disputed and there would have been no rational basis for instructing the jury on the lesser included offenses.

Finally, Roy argues that the district court erred in admitting evidence of his flight from police officers after he abandoned his car in North Dakota, and in instructing the jury on the inference that may be drawn from flight. He argues that evidence of the flight was inadmissible because he fled on account of the hit and run traffic violation, rather than the murder.

Evidence of flight in this jurisdiction is admissible to show consciousness of guilt if there is a sufficient basis in the evidence to warrant the inference that the flight "was prompted by considerations related to the issue in question". *United States v. Peltier*, 585 F.2d 314, 323 (8th Cir.1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). In this case there is abundant reason to conclude that Roy's flight could be considered evidence of guilt. First, the trip to North Dakota was begun immediately after the murder and was apparently for the purpose of fleeing the murder scene. The flight from the police took place within a few hours after the murder. The murder weapons were in the car Roy ran away from, and since that car had been used to transport White's bloody corpse, it was almost certain that the car would reveal further evidence of the crime (which it did). *Cf. id.* at 322–25 (evidence admitted when defendant fled immediately after crime and abandoned vehicle containing evidence linking him to murder and his flight from car was simply continuation of original flight).

The fact that Roy also had committed a traffic violation which could have been the reason for his flight does not render evidence of the flight inadmissible to show consciousness of guilt. In *Peltier* evidence of flight was admitted to prove consciousness of guilt for two 1975 murders, even though Peltier was also wanted for a 1972 murder attempt. *Id.* at 321. In this case, evidence of Roy's traffic violation was before the jury and the jury could weigh it in deciding what meaning to give to Roy's flight.

Roy argues the jury instruction on flight was erroneous because it differed from the instruction Roy proposed by giving a shorter caveat cautioning that flight does not necessarily indicate guilt.[8] The district

---

**8.** Roy requested the following caveat:

In your consideration of the evidence of flight you should consider that there may be reasons for this which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to confront the police, or reluctance to appear as a witness.

Let me suggest that the feeling of guilt does not necessarily reflect actual guilt.

The court gave the following caveat:

Consider, though, whether such flight was for some other reason than an apprehension of guilt. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to any such evidence are

court has broad discretion in giving jury instructions. *United States v. Shigemura*, 682 F.2d 699, 704 (8th Cir.1982), *cert. denied*, 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed. 2d 962 (1983). A defendant "is not entitled to a particularly worded instruction where the instructions given by the trial judge adequately and correctly cover the substance of the requested instruction." *United States v. Manning*, 618 F.2d 45, 48 (8th Cir.1980). The instruction the court gave here covered the basic idea contained in Roy's requested instruction, *see id.*, and the court's decision to give the instruction it gave was well within its discretion.

Roy's conviction is affirmed.

matters exclusively within the province of the Jury.